IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

HOWARD GREGORY CORDELL,

Defendant.

CRIMINAL ACTION FILE

NO. 4:09-CR-006-CAP-WEJ

## **NON-FINAL REPORT AND RECOMMENDATION**

This matter is before the Court for a Report and Recommendation concerning the competency of defendant, Howard Gregory Cordell, to stand trial. For the reasons stated below, the undersigned **REPORTS** that Mr. Cordell is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Therefore, the undersigned **RECOMMENDS** that Mr. Cordell's case be placed on a trial calendar at the District Court's convenience.

# I.   **BACKGROUND**

This case was called for trial on December 6, 2010. (See Trial Transcript

(hereafter "TT") [151]; also filed as Def.'s Ex. 4.) However, on that date defense

counsel alerted the Honorable Charles A. Pannell, Jr., United States District Judge,

of their concerns about Mr. Cordell's mental competency, and requested that he be

examined by Matthew W. Norman, M.D.  (TT. 11.)[1]  Judge Pannell delayed the start

of the trial for a preliminary examination by Dr. Norman, and noted that, depending

on the outcome of that examination, he would transfer the defendant to a Bureau of

Prisons ("BOP") facility for a competency evaluation.  (Id. at 12-13.)  Following a

brief preliminary examination by Dr. Norman at the courthouse, defense counsel

moved to continue the trial based on the psychiatrist's opinion that Mr. Cordell was

incompetent because of a paranoid thought process and paranoid delusions.  (Id. at

---

[1] Defense counsel had utilized Dr. Norman to examine Mr. Cordell on September 16, 2010. Following that examination, Dr. Norman transmitted a letter to defense counsel dated September 29, 2010 (filed under seal as Def.'s Ex. 1), finding that Mr. Cordell was competent to stand trial. (See Transcript of May 2, 2011, Evidentiary Hearing (hereafter "Tr.") [166] 54.) Although Dr. Norman detected "elements of paranoia" that could rise to the level of a paranoid personality disorder or a psychotic disorder, especially at times of high stress, there was insufficient evidence that his paranoia rose to a level that made him unable to assist his counsel. (Def.'s Ex. 1.)

2

46.) The District Court then granted the continuance and granted the Government's

motion for the BOP to conduct an examination of Mr. Cordell. (Id.)

Following those rulings, Mr. Cordell made the following statements to Judge

Pannell in open court:

> I had come here on a special appearance today to discuss actually the
> third party intervener [sic] as secured party on behalf of the debtor
> defendant, and come here to try to settle the case and to hopefully work
> something out with the government to settle the case today. . . . I
> contend and from a place of sovereign and secured party, I'm a
> creditor, that the government doesn't have jurisdiction over me to
> proceed even incarceration of any kind and to have me sent to be
> evaluated mentally. I mean, I believe that they have indicted a
> corporate fiction and that the corporate fiction, I have copyrighted that
> corporate fiction, and that is the reason that I say they don't have
> grounds to incarcerate me is because they have indicted a corporate
> fiction and I'm not that corporate fiction.

(TT. 48-49.)[2]

---

[2] Defense counsel represents that Mr. Cordell also transmitted a multi-page letter dated December 2, 2010, to the United States Attorney entitled, "Memorandum of Record" (filed under seal as Def.'s Ex. 3). (Tr. 54-55.) Its reference line provides:

> CONDITIONAL ACCEPTANCE FOR VALUE (CAFV)–PRIVATE
> INDEPENDENT ADMINISTRATIVE PROCESS–ARTICLE I
> REDRESS OF GRIEVANCE UNDER NINTH AMENDMENT
> RESERVATIONS FOR RESOLUTION AND EQUITABLE
> SETTLEMENT UNDER NECESSITY. IN THE NATURE OF
> REQUEST FOR PROOF OF CLAIM/DISCOVERY

(continued...)

By Order [141] dated December 6, 2010, Judge Pannell directed that defendant undergo a psychiatric examination and evaluation by the BOP, and that a report be prepared and filed pursuant to 18 U.S.C. §§ 4241(b) and 4247(b)-(c). Judge Pannell also ordered that this evaluation address the defendant's competency to stand trial. (Id.)

Following Dr. Norman's preliminary examination on December 6 (discussed supra), the psychiatrist submitted a report to defense counsel dated December 31, 2010, concerning Mr. Cordell's competency to stand trial. (See Def.'s Ex. 2, filed under seal.)³ Dr. Norman based his report on about five and one-half hours of interviews conducted in sessions held on September 16, 2010 (three and one-half hours, see supra note 1) and on December 6, 2010 (two hours). (Def.'s Ex. 2 at 1.)

---

²(...continued)

(Def.'s Ex. 3 at 1.) Although lengthy, the letter contains Mr. Cordell's proposed settlement of the case as a commercial party, and his assertion that, if the government failed to respond, the case should be dismissed. The letter also repeats Mr. Cordell's claim that he is not subject to the jurisdiction of the United States Courts. (Id.) The Government's expert, Ron Nieberding, Ph.D., did not have this document when he evaluated Mr. Cordell. (Tr. 41.)

³ The record also contains the testimonial experience of Dr. Norman (Def.'s Ex. 1A) and his Vitae (Def.'s Ex. 1B).

4

There is no indication in the report that Dr. Norman performed any tests on Mr. Cordell.

Dr. Norman's report states that Mr. Cordell was aware of the charges made against him and aware of the possible consequences of a plea or conviction. (Def.'s Ex. 2 at 2.)[4] He also understood the roles of a trial's various participants (i.e., the defense attorney, the prosecutor, the jury, and the judge). (Id.) According to the defendant's psychiatrist, Mr. Cordell reported that he thought he could work with an attorney. (Id. at 3.)

However, Dr. Norman wrote that there was "evidence of a thought disorder, specifically grandiose and paranoid delusional thinking, which interfered with his ability to relate to me." (Def.'s Ex. 2 at 3.) Dr. Norman's report includes the following statement by defendant as an example of why he believes that Mr. Cordell's thoughts were psychotic:

> In 1933, our government formed a bank–the Federal Reserve. There were eight fathers in 1910. They all went to Jekyll [Island] and wanted a world bank. See the government doesn't have jurisdiction. The prosecutor is currently prosecuting a corporate fiction that was

---

[4] This finding by Dr. Norman certainly undercuts defendant's claim that the Memorandum of Record (Def.'s Ex. 3, discussed supra note 2) shows that Mr. Cordell does not understand the possible consequences of a plea or conviction.

established by the government. If they do move this trial forward, everyone who participates will be in violation of the copyright laws.

(Id.)

Dr. Norman's report also reflects that Mr. Cordell believes that the criminal proceedings against him were ordered by Senior United States District Judge Robert L. Vining, Jr. (who tried the civil case that Mr. Cordell filed against his home's insurer), because the judge holds a grudge against him. (Def.'s Ex. 2 at 3.) Moreover, Mr. Cordell believes that Judges Vining and Pannell talk regularly about his case. (Id.) The report contains the following opinion regarding competency:

At the time of the evaluation, Mr. Cordell showed adequate verbal skills and was aware of the charges against him. He had a sufficient understanding of plea bargaining and court procedure. He also showed the ability to provide an account of his actions with respect to the offense charged. However, there was significant evidence of a thought disorder, specifically paranoid and grandiose delusional thinking, which interfered with his ability to relate to me. The behavior that Mr. Cordell exhibited during this evaluation was consistent with some of the observations noted on his previous evaluation and by his current counsel of record. During the first evaluation, Mr. Cordell was less tangential and could be brought back "on point." During the more recent evaluation, many of Mr. Cordell's thoughts were delusional and psychotic. This would currently interfere with his ability to assist his counsel in his defense.

In my opinion, Mr. Cordell has a psychotic thought disorder. This illness is currently untreated.

6

> In my opinion, at the time of the evaluation, Mr. Cordell was **not** competent to stand trial. The defendant appears to be in need of inpatient psychiatric hospitalization for stabilization of his psychiatric condition and possible restoration of competency.

(Def.'s Ex. 2 at 4.)

Mr. Cordell arrived at the BOP's Metropolitan Correctional Center in Chicago, Illinois, on December 17, 2010. He stayed there until late-February 2011. (Tr. 8, 29.) Following that evaluation period, the Court received a February 22, 2011, "Forensic Report" on Mr. Cordell prepared by Dr. Nieberding, a licensed clinical psychologist employed by the BOP. (See Govt. Ex. 2 (filed under seal).) This Forensic Report concludes that Mr. Cordell is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. (Id.)[5]

---

[5] In the "Sources of Information" section of that Forensic Report, Dr. Nieberding listed documents and sources of information reviewed in formulating his opinion. (Govt. Ex. 2 at 2.) Listed among those is "[c]ommunication with T. Hawker and T. Waldrop, Defense Attorneys." (Id.) Dr. Nieberding clarified on cross-examination that the communication he referenced was his receipt from defense counsel of a copy of Dr. Norman's report. (Tr. 28.) Although he did not interview defense counsel, Dr. Nieberding testified that he sent them an email requesting any behavioral observations that caused them specific concern about the defendant's competency, but he received no reply. (Id.)

## II. THE HEARING

The undersigned conducted an evidentiary hearing in this matter pursuant to 18 U.S.C. § 4247(d) on May 2, 2011 [165].[6] At that hearing, counsel for the Government called Dr. Nieberding to testify via video conference as an expert witness. With no objection by defense counsel, the Court accepted him as such. (Tr. 5-8.) Dr. Nieberding's Vitae is Government Exhibit 1.

Dr. Nieberding's direct testimony describes how he reached the opinion contained in his Forensic Report. In sum, the psychologist determined that, after multiple interviews with the defendant lasting a total of about four hours and after administration of four psychological tests,[7] Mr. Cordell is competent to stand trial. (Tr. 12-27, 29-31.)

---

[6] To expedite matters, counsel elected to argue the competency issue orally; thus, the undersigned conducted a telephone hearing for that purpose on May 11, 2001, a transcript [169] of which is in the record. The page numbering of that second transcript (i.e., Tr. 61-91) picks up where the hearing transcript ends (i.e., Tr. 1-60).

[7] Those tests were the Wechsler Abbreviated Scale of Intelligence (WASI); the Validity Indicator Profile (VIP); the Minnesota Multiphasic Personality Inventory-2 (MMPI-2); and the Examination of Competency to Stand Trial-Revised (ECST-R). (Tr. 12-13, 16-22.)

In his discussions with Mr. Cordell, Dr. Nieberding learned that the defendant had no history of mental health treatment. (Tr. 14.) He also had not been hospitalized for psychiatric treatment nor participated in any substance abuse treatment. (Id.) His demeanor during these interviews was guarded, given his stated concern for confidentiality (which he claims had been breached in the past), but he was cooperative in the process and appropriate in his interactions with the psychologist and his staff. (Id.) He appeared rational in those interviews and had a logical train of thought (although at times his answers drifted from the original question until prompted to return). (Id. at 14-15.) Although he appeared suspicious of others and anxious about the current legal proceedings, Dr. Nieberding opined that these feelings did not rise to the level of a mental disease or defect. (Id. at 15.) Mr. Cordell sat still in the interviews, communicated clearly, and had normal speech, tone, and rate of speech. (Id.)[8]

---

[8] During cross-examination, defense counsel queried Dr. Nieberding about whether he had asked Mr. Cordell about the issues raised in Dr. Norman's report, i.e., the delusional and paranoid thinking. (Tr. 31, 33-34.) Dr. Nieberding testified that he did ask Mr. Cordell about those issues, but he refused to discuss them. (Id. at 31-32.) Thus, Mr. Cordell did not talk to Dr. Nieberding about his mistrust of the Government; that the Federal Reserve was created at a meeting on Jekyll Island; that the Government was prosecuting a corporate fiction; that his birth certificate had been pledged to the Secretary of the Treasury; that he was a secured party creditor; (continued...)

Of the tests mentioned above (see supra note 7), the WASI measures general cognitive functioning. (Tr. 16.) In this test of Mr. Cordell's verbal and non-verbal intellectual ability, he scored in the average range. (Id.) Given that test score, Dr. Nieberding opined that Mr. Cordell would have no trouble comprehending the proceedings against him. (Id.)

The VIP is a response style measure. (Tr. 16.) According to Dr. Nieberding, an important factor in forensic work is to gauge how an individual approaches the assessment tool. (Id.) The VIP provides information about the individual's level of motivation and how straightforward he is in responding to the test's questions. (Id. at 16-17.) The results of Mr. Cordell's VIP test showed that he was honest and straightforward in his approach to the tasks assigned. (Id. at 17, 49.) This test score supported Dr. Nieberding's conclusions that Mr. Cordell was competent to stand trial and assist his lawyers. (Id. at 17.)

The third test, the MMPI-2, is a widely used personality inventory which assesses an individual's traits or tendencies. (Tr. 17.) In this test, a subject

---

⁸(...continued)

that a bonded fund of money exists in his name; that the Court lacks jurisdiction over him; that signing his name over postage stamps copyrights documents in the case; and that if the trial moves forward, anyone involved will be violating copyright laws. (Id. at 32-33.)

10

completes a self-report inventory by answering a multitude of true-false questions

to reveal whether he has some level of psychological issue. (Id.) The test has two

parts. The first part reveals whether the subject is consistent in how he responds to

questions. (Id.) Mr. Cordell's answers were consistent. (Id. at 17-18.)[9] The second

part makes clinical findings. (Id. at 18.) The test showed that Mr. Cordell displayed

some degree of suspiciousness, which was consistent with his self-report discussed

earlier. (Id. at 18, 41.) In other words, Mr. Cordell felt wronged, misunderstood,

and unjustly scrutinized by the criminal justice system. (Id. at 18, 42.) However,

Dr. Nieberding opined that this suspiciousness did not rise to the level of a mental

disease or defect. (Id. at 18, 41-42.) Moreover, the MMPI-2 is not a diagnostic

instrument. Psychologists do not base a diagnosis on one score or one scale score.

(Id. at 18.) Indeed, Dr. Nieberding testified that Mr. Cordell would hardly be the

first defendant to feel wrongful accused and mistreated by the criminal justice

---

[9] According to Dr. Nieberding, the MMPI-2 has validity scales, which suggest that Mr. Cordell answered its questions in a straightforward and honest manner. (Tr. 48-49.)

system. Thus, the psychologist opined that Mr. Cordell's score on the MMPI-2 was indicative more of his circumstances given his current life situation. (Id.)[10]

Finally, the ECST-R is designed to address issues related to trial competency. (Tr. 19.) Its questions are based on the so-called Dusky standard,[11] used in the federal courts to determine trial competency. (Id.) The ECST-R is composed of four parts. It asks specific questions about a defendant's (1) factual understanding of the proceedings; (2) rational understanding of the proceedings; and (3) ability or capacity to assist counsel. (Id.) The ECST-R's fourth component is a series of validation questions from which a determination is made about how straightforward and truthful an individual was in his responses to the other three sets of questions. (Id.)

---

[10] On cross-examination, defendant's counsel questioned Dr. Nieberding about one of the scores Mr. Cordell received on his MMPI-2–a 72 on the paranoia scale. (Tr. 42-44.) The psychologist conceded that this score is outside the normal range, approximately one-half of a standard deviation above the mean. (Id. at 44.) A score of 72 would place Mr. Cordell above the 96th percentile. (Id. at 45.) However, the psychologist reiterated that the MMPI-2 is not a diagnostic instrument, and that a diagnosis of paranoia cannot be based on any one elevated score. (Id. at 44-46.)

[11] See Dusky v. United States, 362 U.S. 402 (1960) (per curiam).

According to Dr. Nieberding, Mr. Cordell's results on the ECST-R suggest that there are no significant deficits in terms of his rational or factual understanding of criminal proceedings or overt problems with his ability to assist counsel. (Tr. 19.) Specifically, Mr. Cordell understood that the criminal proceedings against him were adversarial in nature. (Id.) He also understood the roles of both the judge and the jury. (Id. at 19-20.) He was able to describe the nature of the charges against him and the possible sentences he might receive if convicted. (Id. at 20.) Moreover, Mr. Cordell understood what the possible outcomes of a trial would be–either exoneration or incarceration–and that he could engage in plea bargaining with the government instead of going to trial. (Id. at 20-21, 40.)[12]

With regard to his ability to assist his attorneys, Dr. Nieberding testified that Mr. Cordell asserted a three-fold expectation of his trial counsel: (1) file motions; (2) enter evidence he deemed important or appropriate; and (3) not agree to anything

---

[12] Dr. Nieberding and Mr. Cordell also discussed his prior court experiences. (Tr. 21.) The defendant reported that he had never engaged in any inappropriate conduct in court and never experienced any psychiatric symptoms in court. (Id.) The undersigned has made similar observations about Mr. Cordell; at all times, he has been courteous and well behaved in court.

13

without his consent.[13] (Tr. 21.) If he disagreed with his attorneys, Mr. Cordell stated that he would try to "talk it out" with them. (Id. at 22.) The psychologist reported that Mr. Cordell appeared to be straightforward and honest with him in describing how he would work with trial counsel, and he identified no deficits in the defendant's ability to assist counsel during trial. (Id.)[14]

Dr. Nieberding added that, compared to most defendants, Mr. Cordell was more knowledgeable about the legal system due to his prior involvement in litigation. (Tr. 22.) Although the defendant is strong-willed, opinionated, and likely to take an active role in trial strategy, the psychologist opined that this did not rise to the level of a mental disease or defect. (Id. at 23.)

The government's expert also testified about the diagnostic impressions he had made about Mr. Cordell. Diagnostic impressions, which consist of five ratings,

---

[13] On cross-examination, Dr. Nieberding conceded that he did not ask Mr. Cordell what motions he wants filed and what evidence he wants introduced. (Tr. 34-35.) Dr. Nieberding also conceded that he did not ask Mr. Cordell about the items to which he was willing or unwilling to consent. (Id. at 36.)

[14] Mr. Cordell reportedly was not happy with his attorneys for causing the mental evaluation to occur and believed it unnecessary. (Tr. 22, 48.) Indeed, he characterized his transportation to Chicago for evaluation as kidnapping. (Id. at 47-48.) There is no indication that Mr. Cordell initiated the evaluation to delay trial. (Id. at 48.)

14

measure an individual's current mental functioning and whether he meets criteria for a specific disorder. (Tr. 24-25.) In Axis I, which is reserved for major psychiatric conditions, Dr. Nieberding's only diagnosis was alcohol abuse, which was in remission since defendant has been detained in a controlled environment. (Id. at 23.) Under Axis II, which deals with personality disorders, Dr. Nieberding made no diagnosis. (Id.) Under Axis III, which lists medical conditions, the psychologist identified Mr. Cordell as having suffered from gout in the past. (Id. at 23-24.) Under Axis IV, which addresses psycho-social stressors, i.e., things that may be going on in an individual's life that impact him to some degree, Dr. Nieberding testified that Mr. Cordell was experiencing legal difficulties. (Id. at 24.) Finally, under Axis V, which is reserved for a numerical value representing an individual's Global Assessment of Functioning (ranging from 1 to 100), Dr. Nieberding testified that he rated Mr. Cordell's GAF score at 65. (Id.)

Near the end of his direct testimony, Dr. Nieberding stated that he was familiar with the so-called "sovereign citizen" movement and had evaluated persons who adhered to those beliefs. (Tr. 25.) The sovereign citizen movement has a variety of different levels of adherence and has no one principle upon which all followers agree. (Id. at 25, 50-51.) In general, however, persons who espouse that

15

view have some question about the government and believe that it has no jurisdiction over them for a variety of reasons. (Id. at 24-25.) Some may espouse these views to circumvent the legal system; others may assert these views because they are mentally ill. (Id. at 51.)

Dr. Nieberding added that his evaluation of Mr. Cordell did not reveal that he held sovereign citizen beliefs, but that he had seen some reference to that belief system in Dr. Norman's report. (Tr. 25.) Sovereign citizen adherents are not rendered incompetent to stand trial simply by holding those beliefs. (Id. at 25, 52.)[15] Instead, the pertinent question is: To what degree does that belief system impact a person's ability to assist counsel or his rational understanding of the proceedings? (Id. at 52.) Thus, Dr. Nieberding has opined—on rare occasions—that persons holding that belief system were incompetent to stand trial. (Id. at 51.) However, on most occasions he has offered the opinion that such persons are competent. (Id. at 52-53.) Furthermore, Dr. Nieberding opined that persons with paranoid thoughts can understand the nature of the proceedings against them and be capable of assisting their counsel, thus making them competent to stand trial. (Id. at 53.)

---

[15] Dr. Nieberding conceded that he has no evidence that Mr. Cordell asserted sovereign citizen beliefs to avoid trial. (Tr. 50.)

16

Finally, Dr. Nieberding reviewed Dr. Norman's report. (Tr. 26.) He testified that it lacked what he called a basis for a determination of incompetency. (Id. at 27.) Although Dr. Norman made a finding of incompetence, Dr. Nieberding stated that it was not clear why Mr. Cordell's reported symptoms were impacting his ability to assist his counsel. Morever, Dr. Norman's report made no formal diagnosis of any mental disease or defect. (Id.) Instead, there was a reference to some evidence of paranoid delusion. (Id.) Dr. Nieberding's evaluation revealed no paranoid delusion disorder. (Id.)

Counsel for Mr. Cordell subjected Dr. Nieberding to a thorough and sifting cross-examination (some of which has been discussed supra in footnotes accompanying the discussion of the psychologist's direct testimony).[16] For instance, Dr. Nieberding agreed that whether a defendant's judgment in making legal decisions is impaired goes to the core of the Dusky standard. (Tr. 37.) However, the psychologist opined that persons who espouse sovereign citizen views may believe that they are legitimate, but that does not mean that they have a mental

---

[16] After Mr. Cordell's counsel apparently refused to ask certain questions of Dr. Nieberding that the defendant believed relevant, Mr. Cordell held up a legal pad on which he had written, "You're Fired." He subsequently announced that had fired one of his lawyers. (Tr. 51.) However, given that his lawyers are appointed, the Court informed Mr. Cordell that only the Court could fire one of his attorneys. (Id.)

disease or defect. (Id. at 38.) Such persons may simply be guilty of bad judgment in life as well as in court. (Id. at 38-39.) However, Dr. Nieberding conceded that, if the reason for the exercise of bad judgment is a firm and fixed belief about an irrational notion, then that could potentially interfere with a person's ability to assist counsel and rationally understand the proceedings. (Id. at 39.)

As for the suspiciousness referenced earlier, the psychologist conceded that Mr. Cordell would not talk to him about this issue. (Tr. 47.) Thus, Dr. Nieberding had no context for Mr. Cordell's elevated paranoia score on the MMPI-2 (see supra note 10) to help him decide whether that paranoia rose to a level that interfered with his ability to assist counsel. (Id.) Moreover, Dr. Nieberding's interviews with Mr. Cordell revealed notions of paranoia, in that he believes Judges Vining and Pannell discuss his case. (Id.)

The defendant called no witnesses at the hearing, but placed several documents in the record, some of which the Court admitted under seal because they contain sensitive medical information.[17] (Tr. 54-56.) Those documents filed under seal include: Dr. Norman's initial letter of September 29, 2010 (Def.'s Ex. 1); his

---

[17] Despite the sensitive nature of those documents, the Court has been obligated to summarize them to provide the District Judge with a complete Report.

report dated December 31, 2010 (Def.'s Ex. 2); and defendant's Memorandum of Record dated December 2, 2010 (Def.'s Ex. 3).

## III. DISCUSSION

The issue here is whether a preponderance of the evidence shows that the defendant is incompetent to stand trial. 18 U.S.C.§ 4241(d). Under the governing statute, incompetentcy exists if "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." Id. § 4241(a). The issue of a defendant's competency to stand trial raises due process concerns. Drope v. Missouri, 420 U.S. 162, 171-72 (1975). Thus, in applying the competency statute, the Supreme Court defined the contours of that due process right, holding that the test for determining competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of understanding–and whether he has a rational as well as factual understanding of the proceedings against him." Dusky, 362 U.S. at 402.

The Government's expert, Dr. Nieberding, makes a strong case through his Forensic Report and hearing testimony that Mr. Cordell is not presently suffering

19

from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. The psychologist's report is current, very detailed, and supported by hours of interviews and numerous psychological tests. Moreover, in his live testimony, Dr. Nieberding defended the opinion presented in that report against vigorous cross-examination.

The only counter to Dr. Nieberding's report and testimony is Dr. Norman's report. The Government did not object to the Court's consideration of Dr. Norman's report,[18] but argues that it should be given less weight because (1) it was not supported by live testimony (which could have been tested by cross-examination); (2) it is less recent than Dr. Nieberding's report; (3) it is less detailed and comprehensive that Dr. Nieberding's report; (4) it is not supported by any testing; (5) it conflicts with his earlier report of September 29, 2010, which found the

---

[18] The Government takes this position because its research shows that the law is unsettled on whether expert reports–usually deemed inadmissible hearsay–may be considered in competency hearings. (See emails from counsel, dated May 11-12, 2011 [167].) Moreover, defense counsel represents that the Government subpoenaed Dr. Norman's records and chose not to call him to testify with the understanding that the defense would tender Dr. Norman's report. (Id.) Given the Government's position and counsel's representation, the Court has considered Dr. Norman's report but, as noted infra, gives it less weight than Dr. Nieberding's report.

defendant competent; (6) it contains favorable observations about Mr. Cordell's ability to understand the nature and consequences of the proceedings against him; and (7) Dr. Norman's report is couched in terms of there being "evidence" of a thought disorder, but does not adequately explain why his observations support the ultimate conclusion that Mr. Cordell is incompetent. (See emails from counsel.)[19]

The record thus contains the testimony and report of Dr. Nieberding that Mr. Cordell is competent to stand trial, and the report of Dr. Norman, which asserts that Mr. Cordell is not competent to stand trial. However, the Court must accord less weight to Dr. Norman's report for the seven reasons argued by the Government in the preceding paragraph. Thus, the Court credits and accepts Dr. Nieberding's opinion that the defendant is competent to stand trial.

As for Mr. Cordell's belief that he is not subject to the jurisdiction of the United States Courts (i.e., the so-called sovereign citizen claim), there is no finding by Dr. Nieberding that this belief (assuming it is genuine) constitutes a mental disease or defect. Granted, Mr. Cordell would not discuss his beliefs on this point

---

[19] In closing argument, both counsel agreed that Dr. Norman believes that Mr. Cordell understands the nature of the proceedings against him, but is not capable of assisting his counsel. It was defense counsel who argued, based on his interaction with Mr. Cordell, that he is unable to assist counsel. (Tr. 88-90.)

with Dr. Nieberding. However, Dr. Nieberding testified that persons who assert that they are sovereign citizens are not necessarily suffering from a mental disease or defect. (Tr. 52.) As the psychologist made clear, the issue is not what these persons espouse, but whether those beliefs impact their ability to understand the nature and consequences of the proceedings against them or to assist properly in their defense. (Id. at 52-53.) Nothing in Dr. Nieberding's interaction with Mr. Cordell and his extensive testing of him reveals that his ability to understand the nature and consequences of the proceedings against him or to assist properly in his defense is compromised sufficiently to declare him incompetent.

The Court has no doubt that Mr. Cordell is a difficult client who, given his experience with the legal system, may seek more than most defendants to direct trial strategy or second-guess his lawyers. Moreover, he may even seek to shape trial strategy to conform to his sovereign citizen beliefs. However, the Eleventh Circuit's decision in Battle v. United States, 419 F.3d 1292 (11th Cir. 2005), provides guidance here.

In Battle, experts for both the prosecution and the defense examined the defendant to determine whether he was competent to stand trial. Battle, 419 F.3d at 1295. Mr. Battle consistently reported to the doctors that he "felt 'pain and

22

sensations' due to microchip implants that had been put inside his body by prison staff to monitor and control him." Id. at 1296. Those experts testified before a magistrate judge at a competency hearing. All defense experts agreed that the defendant was incompetent due to paranoid schizophrenia. (Id.) The government's experts disagreed. Id. Despite the diametrically conflicting opinions, the magistrate judge found Mr. Battle competent to stand trial. Id. The district judge agreed. Id.

Before the jury was brought in for opening statements, Mr. Battle told the district judge that he disagreed with his attorneys and the evidence they planned to present, asserting that he preferred that they present more credible evidence. Battle, 419 F.3d at 1297. He also complained that he felt pains and sensations and that it was difficult for him to focus. Id. After the trial began, the defendant exhibited some disruptive behavior, mainly by speaking out in front of the jury to correct or agree with a witness. Id. He also rocked "back and forth" in his chair. Id. Moreover, Mr. Battle frequently expressed dissatisfaction with his lawyers because they were unwilling to present a defense based upon the implants he believed were in his head. Id. Over his attorneys' objections, Mr. Battle testified as the first defense witness, admitted to the murder for which he had been charged, acknowledged it was wrong to kill, and told the jury about the implants. Id.

23

On appeal following conviction, the Eleventh Circuit found no clear error in the competency finding: "[A] district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion." Battle, 419 F.3d at 1299. Moreover, the defendant's frustration at his attorneys' unwillingness to present his implant defense did not show that he was incompetent. According to the circuit, a client's exhibition of "an antagonistic relationship with his lawyers over their representation of him is no indicator of incompetency. Many criminal defendants differ with their lawyers on how best to represent them." Id. Finally, the court held that Mr. Battle's courtroom outbursts, odd behavior, and history of mental illness did not mandate a finding of incompetence. Id.

Here, the experts' views on defendant's competence are opposed, but the Court must credit Dr. Nieberding's opinion that defendant is competent for the reasons mentioned above. Additionally, the statements that Mr. Cordell have made in open court or committed to paper are of less concern than the defendant's statements in Battle. The potential problems that defendant's counsel may face in managing Mr. Cordell at trial are insufficient to deem him incompetent. The bottom

line is that the evidence fails to show that the defendant's unconventional beliefs render him incompetent.

Given the testimony and documentary evidence received at the hearing, the Court concludes that Mr. Cordell is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Stated differently, a preponderance of the evidence shows that Mr. Cordell has sufficient present ability to consult with his lawyers with a reasonable degree of understanding and a rational as well as factual understanding of the proceedings against him.

## IV. CONCLUSION

For the reasons explained above, the undersigned **REPORTS** that Mr. Cordell is competent to stand trial.

**SO RECOMMENDED**, this $\underline{2\,3}$ day of May, 2011.

Walter E. Johnson
UNITED STATES MAGISTRATE JUDGE

25

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

HOWARD GREGORY CORDELL,

Defendant.

CRIMINAL ACTION FILE

NO. 4:09-CR-06-CAP-WEJ

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1A(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party. The party filing objections

will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court.  Failure to object to this Non-Final Report and

Recommendation waives a party's right to review.  Fed. R. Crim. P. 58(b)(2).

The Clerk is directed to submit the Non-Final Report and Recommendation

with objections, if any, to the District Court after expiration of the above time

period.

**SO ORDERED**, this $23$ day of May, 2011.

Walter E. Johnson
UNITED STATES MAGISTRATE JUDGE